IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JOHN HALDEMAN, | : | |
| Plaintiff | : | |
| | : | |
| v. | : | C.A. NO. 8282-MA |
| | : | |
| MARJORIE LEE WORRELL, and | : | |
| THE ESTATE OF MARJORIE L. | : | |
| TYSON, by and through its Executrix | : | |
| Marjorie L. Worrell, | : | |
| Defendants | : | |

MASTER'S REPORT
Date Submitted: September 28, 2015
Draft Report:  December 31, 2015
Final Report:  June 16, 2016

Dean A. Campbell, Esquire of The Law Office of Dean A. Campbell, LLC, Georgetown, Delaware; Attorney for Plaintiff.

David N. Rutt, Esquire of Moore & Rutt, P.A., Georgetown, Delaware; Attorney for Defendants.

AYVAZIAN, Master

This is a case about an elderly woman who, although she was dying of cancer and almost entirely dependent on others for her care, had the strength of character to reclaim some of her independence and dignity in the last few months of life. Sadly, the outcome of her struggle has now pitted her nephew against her niece, each claiming the other is guilty of having exploited their aunt. Nephew and niece currently are tenants-in-common of their aunt's Lewes Beach house, and the niece is the sole beneficiary of their aunt's estate. Nephew claims that the Lewes Beach house should be his alone because he had an oral contract with his aunt who had agreed to leave him the house in exchange for his help in paying her bills. Nephew accuses his cousin of fraud, misrepresentation, and having unduly influenced their aunt toward the end of her life to transfer their aunt's half-interest in the Lewes Beach house to her niece, thereby severing the joint tenancy with the right of survivorship that her nephew previously had enjoyed, and to change her will. The niece, in turn, accuses her cousin of breaching his fiduciary duty to their aunt, and demands an accounting of her cousin's handling of their aunt's finances and the return of funds and personal property belonging to their aunt. A trial in this matter was held over four days. This is my draft report following post-trial briefing in which I recommend that the Court deny the nephew's request for rescission of the his aunt's will and assignment of lease, and grant the niece's request for an accounting and the return of certain property.

I. Factual Background

Marjorie Lee Tyson was nearly 89 years old when she died of ovarian cancer in the Delaware Hospice Center in Milford, Delaware on November 7, 2012. Mrs. Tyson had had a career as a laboratory technician at Sun Oil (now Sunoco) in southeastern Pennsylvania from the end of World War II until the late 1970s or early1980s when she retired. She managed her own money, was an inveterate shopper, spent as much time as possible at her Lewes Beach house, and hosted family gatherings during the holidays in her Boothwyn, Pennsylvania home.

Mrs. Tyson apparently was a generous and loving person. Although she had no children of her own, Mrs. Tyson housed her nephew, Plaintiff John Michael Haldeman, for two years while he finished high school after he had been kicked out of his own home by his mother, who was Mrs. Tyson's sister. After Mrs. Tyson learned that her husband had fathered a son out of wedlock, Mrs. Tyson overcame her distress and accepted the young boy as her stepson. Her relationship with her husband's son deepened as he grew to adulthood and, at his wedding, her stepson honored Mrs. Tyson by calling her his second mother. When Mrs. Tyson's husband was later accused of having repeatedly raped one of Haldeman's sisters, Mrs. Tyson refused to believe that her husband was guilty. Nevertheless, starting around the year 2000, she moved to Lewes, and lived most of the year at her beach house while her husband remained in their Boothwyn residence. While

3

living apart from her husband, Mrs. Tyson maintained an active social life. She enjoyed a close friendship with Twila Farrell, who owns two women's clothing stores, one in Lewes and the other in Pennsylvania. Other close friends included Lewes residents Billie Ann Buckaloo and her sister Aris, who are also long-time friends and contemporaries of Defendant Marjorie Lee Worrell, Mrs. Tyson's niece.

Mrs. Tyson was the oldest of four children in a family that had moved from North Carolina to southeastern Pennsylvania during the Great Depression because there was work available at Sun Oil. Her parents, John and Rosalie Hair, purchased a house at 12 Massachusetts Avenue on Lewes Beach, and their grandchildren, including Haldeman and Worrell, who is the daughter of Mrs. Tyson's brother John M. Hair, spent their summers on Lewes Beach as young children and teenagers. When Mrs. Tyson's mother passed away in the 1970s, she left her Lewes Beach house to Mrs. Tyson.[1] The property was leased from the City of Lewes, and Mrs. Tyson and her husband spent approximately two years renovating the two-story house into two apartments.[2]

---

[1] JX 74. More precisely, Mrs. Hair gave her daughter an option to purchase the Lewes Beach house for $30,000, which Mrs. Tyson exercised.

[2] The upstairs apartment consists of two bedrooms, bathroom, living room, kitchen, and laundry room. The downstairs apartment has two bedrooms, a living area, small kitchen and bathroom. Each apartment has a separate exterior entrance with no interior access between the apartments.

4

Around 2005, Mrs. Tyson's husband suffered a heart attack, and she returned to Boothwyn to take care of him. Not long after he passed away in 2006, Mrs. Tyson began to experience health problems of her own. She was diagnosed with Parkinson's disease, and subsequently found to have Stage IV ovarian cancer. At the time, Haldeman was residing in Millsboro, Delaware, where he had settled after retiring from 23 years of military service. Haldeman, who is divorced, has a daughter, Patricia Haldeman High, known as "Trisha," who lives in Greencastle, Pennsylvania. He also had a son, John Michael Haldeman II, known as "Mikey", who resided in Milton, Delaware and had his own construction business, according to Haldeman. Around 2007 or 2008, Mikey moved into his great aunt's residence in Boothwyn to help Mrs. Tyson who was then undergoing chemotherapy.

Worrell's parents lived about two miles away from Mrs. Tyson's residence in Boothwyn. Worrell's mother died in 2007, but before her death, Worrell's father had been his wife's primary caregiver. In 2002, Worrell retired from teaching in Pennsylvania and moved to Lewes. Almost immediately, she started teaching again at Indian River High School. As their only child, Worrell spent her weekends traveling back and forth between Lewes and Boothwyn to help her elderly parents. After her mother's death, Worrell moved her father down to Lewes to live with her and her husband. Worrell finally retired in 2013 after a teaching career that spanned over 40 years.

According to Haldeman, he started paying his aunt's bills from his own checking accounts after he discovered a stack of unpaid bills during a visit to Mrs. Tyson's Boothwyn residence sometime after 2006. When he questioned his aunt about them, Mrs. Tyson simply told her nephew that she had no money to pay them. Haldeman testified that at the time he had hoped to be reimbursed eventually. By 2008, however, Haldeman realized that his aunt was not going to reimburse him. According to Haldeman, when he explained to his aunt that he was expending a lot of his own money while she was still "spending like crazy," they agreed that he would continue to pay the basic bills until his aunt was able to pay some of them, and half of the Lewes Beach house would go in his name. Haldeman would not receive any reimbursement, but upon Mrs. Tyson's death, the entire house would be left to him.

The record shows that an assignment of lease was executed by Mrs. Tyson on February 22, 2008, in which she assigned her leasehold interest in the Lewes Beach house to herself and Haldeman as joint tenants with right of survivorship.[3] The document was drafted by Larry Fifer, a Lewes attorney whom Farrell had recommended to Mrs. Tyson. On October 23, 2008, Mrs. Tyson executed a General Durable Power of Attorney appointing Haldeman as her agent.[4] At trial,

---

[3] JX1.
[4] JX 7.

Haldeman could not recall exactly when their alleged oral agreement was reached, i.e., whether it occurred before or after Mrs. Tyson executed the assignment of lease.

Mikey resided with Mrs. Tyson in Boothwyn until August 2011 when Haldeman moved Mrs. Tyson and Mikey to the Lewes Beach house. At trial, Haldeman gave several reasons for moving his aunt down to Lewes. First, he claimed that by mid-2011, Mrs. Tyson's spending had gotten out of control and he could no longer afford to keep paying her bills. According to Haldeman, Mrs. Tyson handed her ATM card to Mikey, her cleaning lady, or her handyman and instructed them to withdraw $500 in cash on a frequent basis. She would then spend the cash on fancy food like blueberries, steak, and shrimp for herself and her handyman's family. Second, in the spring of 2011, a hospice worker had seen some bank statements or receipts and had accused Mikey of stealing Mrs. Tyson's money.[5] Haldeman testified that he informed the hospice worker that it was not possible that Mikey had taken the cash because some of the withdrawals Haldeman had made himself. Third, Haldeman had his own health problems that made it

---

[5] Mrs. Tyson received hospice care while she resided in Boothwyn and after she moved to Lewes. According to the records, hospice staff, such as social workers, aides, and nurses, visited Mrs. Tyson in her Lewes Beach house almost daily to assist in her care and monitor her physical and mental health. Hospice staff continued to visit her when Mrs. Tyson was moved into a group home operated by Anna Mae Paradis near Milford, Delaware and the family home of Sandra Paredes, where Mrs. Tyson resided for a few months before her death in November 2012.

difficult for him to drive long distances, and his aunt was beginning to hallucinate more.[6]  Fourth, Haldeman thought the move would eliminate some of the utility expenses that he had been paying for his aunt's Boothwyn residence.[7]

Upon Mrs. Tyson's return to her Lewes Beach house, Mikey occupied the downstairs apartment while his great aunt lived upstairs.  When not in bed, Mrs. Tyson spent most of her time in the living room where she sat in a recliner and watched TV.  She had a commode next to her recliner.[8]  Soon after Mrs. Tyson moved in, Haldeman installed a tiny video camera in Mrs. Tyson's living area that was connected to the computer in Mikey's apartment without informing his aunt.

---

[6] Hospice records also indicated that Mrs. Tyson suffered from occasional hallucinations.

[7] According to Haldeman, after Mrs. Tyson's husband died, she added her stepson's name to the title of her Boothwyn house, and then her stepson added his wife's name and somehow removed Mrs. Tyson's name from the title.  Haldeman testified that his aunt had instructed him to engage a lawyer to try to get the property back in her name, so Haldeman wrote a check for $1000, and his aunt talked to an attorney by telephone.  According to a letter dated July 28, 2010, from a Pennsylvania attorney to Mrs. Tyson and Haldeman as her attorney-in-fact, JX 9, it was Haldeman who had informed the attorney that his aunt intended to put her stepson's name on one-half of the property but instead had been tricked into signing the entire title over to her stepson.  A later deed was discovered from the stepson to his wife, and a mortgage lien in the amount of $180,000.  Haldeman had asked the attorney to determine whether the title to the property could be returned to Mrs. Tyson's sole name, and the attorney was requesting a minimum fee of $1000 to obtain a title search, investigate the case, and propose a recommendation.  In the Pre-Trial Stipulation, Worrell alleged that her aunt had deeded the Boothwyn residence to her stepson retaining only lifetime rights for herself.

[8] Mrs. Tyson could walk a few steps with her walker, but preferred using the commode rather than walking to the bathroom.

According to Haldeman, Mrs. Tyson once accused Mikey of mistreatment, and the videotape he showed Mrs. Tyson proved that Mikey had done nothing wrong and that Mrs. Tyson had been caught in a lie.

Whenever Worrell visited her aunt at the Lewes Beach house,[9] she noticed that she was not left alone with her aunt. If Mikey was not present when she arrived, he would quickly come upstairs and stand near Mrs. Tyson's chair with his arms crossed. Worrell complained to Haldeman about the tone of voice his son was using with Mrs. Tyson. According to Worrell, Mikey constantly corrected his aunt whenever she said anything. Worrell told Haldeman that their aunt was afraid to talk, and had told her to be careful of what she said in front of Mikey. The next time Worrell visited her aunt, Mikey tried to intimidate Worrell by physically blocking her access to the steps.

According to Worrell, from the time Mrs. Tyson returned to Lewes in August 2011, she was always agitated and fearful of Haldeman. Mrs. Tyson complained to her niece that there was a camera in the living room and that Mikey was telling her that she was crazy. She showed her niece a bruise on her forearm, and claimed that she and Haldeman had fought over her credit card, and he had

---

[9] Worrell testified that she had stopped visiting her aunt in Pennsylvania after the rapes were disclosed because she did not want to encounter Mrs. Tyson's husband, but she remained friendly with her aunt and saw her at special occasions like weddings.

9

grabbed her by the arm. She said Mikey had moved her portable phone so that she could not use it. She pleaded with Worrell to contact some people to find out what was really going on. She asked Worrell to call Fifer, and she was very upset about missing money, an amount she claimed was in excess of $60,000. Mrs. Tyson allegedly told her niece, "I don't have anything left. They've taken it all."

Farrell was also concerned about her friend. As soon as Farrell heard that Mrs. Tyson was back in Lewes, she became almost a daily visitor to the Lewes Beach house. Farrell testified that Mikey made her fearful and he would make conversation with Mrs. Tyson impossible for her by his presence. She described Mikey as telling Mrs. Tyson that she was lying or did not know what she was saying. Farrell worried that her friend did not have anything to eat or that she did not have her contact in her eye.[10] Mrs. Tyson thought she was being bugged so she asked Farrell to look around the apartment. Farrell found something that she thought was a camera and unplugged it, but she did not find a recorder.

In early October 2011, Worrell arranged for a meeting to take place at her house with Mrs. Tyson, Fifer, and Fifer's partner Lisa Andersen, Esquire. Mrs. Tyson repeated her concerns about her missing money and the injury on her arm at the meeting. Nevertheless, she did not want to make any drastic changes because

---

[10] Mrs. Tyson had vision problems and used a special contact in one eye that she could not insert by herself.

she loved Mikey and depended on Mikey's care to remain in her own home. She claimed that Mikey had stolen her money, but because he had been in trouble with the police so often she did not want him to get in trouble again.[11] Mrs. Tyson also complained about the way Haldeman was treating her. Although Mrs. Tyson expressed her desire to have Worrell's name added to the Lewes Beach house, she was told by the lawyers that it could not be done without a lengthy legal battle. At the conclusion of the October 2011 meeting, it was agreed that the lawyers would research a mechanism to accomplish Mrs. Tyson's goal and report back to her. Mrs. Tyson did not want Haldeman to know about the meeting so Fifer sent his bill to Mrs. Tyson in care of Worrell's address, and Worrell paid it herself.

---

[11] Haldeman testified that before his son moved to Pennsylvania in 2007 or 2008, he had been ordered by the State of Delaware to pay restitution at a rate of $50 per month. The record includes a check on Mrs. Tyson's account that was signed by Haldeman on September 19, 2011, in the amount of $45 made payable to the State of Delaware. Notations on this check indicated that the funds were in payment for Mikey's 2008 Delaware criminal case. JX 6. Haldeman also testified that Mikey had been arrested in Pennsylvania for driving under the influence ("DUI") and had been incarcerated for some period of time during the summer of 2010 or 2011. During his absence, Haldeman and his daughter took turns caring for Mrs. Tyson. The record includes a check dated June 14, 2011, in the amount of $1930.50 payable to CFS (the endorsement on the reverse of the check states "32nd Judicial District Court Financial Service"). This check was also drawn on Mrs. Tyson's account, but was signed by Mrs. Tyson. The notation on the memo line indicates the amount was for the balance of the Delaware County court costs, presumably incurred as a result of Mikey's DUI offense. JX 6. During the trial, Haldeman admitted that he had been told Mikey had a drug problem by one of the hospice workers in Pennsylvania. However, when he had demanded proof, the hospice worker had none. Haldeman also admitted that after his son was killed in the automobile accident, the toxicology report revealed that Mikey had alcohol and minute amounts of marijuana and compressed gas in his system.

After the meeting, Worrell approached Haldeman and informed him that their aunt was upset about her money and had ordered multiple statements from her bank in an attempt to check on her finances. Worrell offered to sit down with Haldeman and Mrs. Tyson every month to go over the bills, and warned Haldeman to be careful. Haldeman became incensed and told his cousin that no one was ever going to accuse him of anything, and that he had paid $50,000 to get his name on the deed.

In November and December 2011, Haldeman and his children took turns traveling to the Boothwyn residence to pack up Mrs. Tyson's belongings. Mrs. Tyson was placed in the Hospice Center for one week of respite care while they cleaned out her house and put most of her personal property in a commercial storage facility. According to Worrell, Mrs. Tyson had instructed Haldeman about the ultimate disposition of her personal property while she was still living in Pennsylvania. Worrell was supposed to get Mrs. Tyson's china, but after her aunt was moved to Lewes, Worrell asked instead to have some of the teacups that her mother had given to Mrs. Tyson years before. Mrs. Tyson agreed and Mikey helped carry a box containing Mrs. Tyson's collection of teacups to Worrell's car. However, Haldeman then called Worrell and demanded the return of the teacups. During the trial, Haldeman played a recording of Worrell's voicemail message

regarding the teacup incident as evidence of Worrell's covetous nature and her inclination to exert improper influence over Mrs. Tyson. [12]

Worrell, Farrell, and Buckaloo continued to visit Mrs. Tyson in her Lewes Beach home and occasionally took her out to the hairdresser or to dinner. Worrell always paid for her aunt because Mrs. Tyson had no money of her own. These witnesses described the condition of Mrs. Tyson's upstairs apartment as cluttered and filthy. Buckaloo also testified that Mikey made her feel unwelcome, but Buckaloo visited much less frequently than the two other women because she was so upset by Mrs. Tyson's living conditions. She described seeing Mrs. Tyson wet with urine sitting next to a full commode, with Mrs. Tyson using the lid of the commode as a tray for her food.

On the night of February 3, 2012, Mikey was killed in an automobile accident on U.S. Route 1 between Rehoboth Beach and Lewes. After Haldeman was informed of his son's death, he attempted to contact Worrell. Unable to reach Worrell because she was asleep at the time, he called Buckaloo who lived across the street from his cousin. Worrell, Buckaloo, and Buckaloo's sister, who also lived in the same neighborhood, drove to Mrs. Tyson's house around midnight. They found her sitting in the recliner and Mikey's dog running around the apartment. Worrell told her aunt that Mikey had been killed. Mrs. Tyson was very

---

[12] JX 79.

quiet for a while, and then she allegedly told her niece that she knew something was going to happen because Mikey and his father had had a shouting match on the telephone before Mikey left the house, and as he was leaving, Mikey had told his great aunt that if she thought things were bad now, it would be worse for her after he was gone.[13] Buckaloo's sister meanwhile went downstairs to Mikey's apartment to get some dog food and when Aris returned, she was looking extremely pale. She kept saying, "Oh my God, you're not going to believe what I've seen." Worrell went downstairs with her because Worrell was looking for her aunt's medications. Mikey's bedroom was strewn with syringes, needles, little baggies, and other drug paraphernalia.

Worrell stayed overnight with Mrs. Tyson. The following day, the police removed three boxes of drug paraphernalia including scales from the downstairs apartment. Worrell called Haldeman to alert him, but he responded that the police could not have found any drugs because his son was clean. Mrs. Tyson was transferred to the Hospice Center at Milford because of the emergency situation.

---

[13] Haldeman denied that he had shouted at his son that evening. He testified that their conversation had been a good one; otherwise, he would not have been able to live with himself after Mikey's death. He also testified that Mikey had told him that he was going out to buy his great aunt her favorite chocolate mint ice cream from Friendly's because she kept pestering him for it. After his son's death, Haldeman told numerous people that Mrs. Tyson was responsible for Mikey's death. He testified that he never said this to his aunt, but Mrs. Tyson was aware that Haldeman blamed her for his son's death.

She grieved for Mikey, but she was very anxious to return home. She also was very concerned about being able to attend Mikey's funeral. On the day of the funeral, Buckaloo drove Mrs. Tyson to the funeral because Worrell had her father in her car. Mrs. Tyson had already dictated to Worrell which clothes and jewelry she wanted to wear to the funeral. According to her niece, Mrs. Tyson was meticulous about her appearance.[14]

After his son's funeral, Haldeman began to look at nursing homes for his aunt. The least expensive one he could find was in Greenwood at $4700 per month, which was far beyond what Mrs. Tyson could afford to pay, according to Haldeman. Farrell found a woman who would provide in-home care for Mrs. Tyson at a cost of $75 per day, five days a week, plus room and board. According to Haldeman, the expense of in-home care would have exceeded Mrs. Tyson's income plus anything additional he could provide. Farrell, however, testified that Haldeman did not even consider this option because he was not interested in having Mrs. Tyson return to her Lewes Beach house.

Haldeman subsequently learned from the Hospice Center of an opening in a group home near Milford that was owned by Anna Mae Paradis. He visited Paradis's double-wide mobile home and saw what he described as a nice little

---

[14] Trisha visited her great aunt on a regular schedule to tweeze Mrs. Tyson's eyebrows. Her last such visit occurred while Mrs. Tyson was living in the group home owned by Paradis.

room with a big screen television, a hospital bed, and a reclining chair. Meals were provided by Paradis. Haldeman signed a contract with Paradis on February 15, 2012. Her fee was $2700 per month, and the first check Haldeman wrote to Paradis was in the amount of $3,000, with the extra $300 to be used on additional items for his aunt like peppermints, licorice, and cell phone minutes.[15] After Mrs. Tyson was moved into the group home, Haldeman started to write checks to himself out of his aunt's account so he could use his own checking account to pay his aunt's bills. Haldeman claimed that it was easier for him to track where the money was going by this method. Haldeman also claimed that it was only after Mrs. Tyson was moved into the group home that he began exercising the power of attorney on her behalf.

Mrs. Tyson hated the group home and wanted to return to her own home on Lewes Beach. According to Farrell, Mrs. Tyson was not allowed her own phone for the first several months she resided in the group home. Visitors were not allowed to take her out to lunch or the hairdresser. Paradis eavesdropped on her conversations with visitors and insulted Mrs. Tyson for thinking herself better than

---

[15] The record includes a few receipts from Walmart and Food Lion that were obtained from Paradis. The receipts appear to include items that were allegedly purchased for Mrs. Tyson. These were for Depends, cell phone minutes, blueberries, raisin nut bran cereal, licorice, and a small grapefruit. The total amount spent was $184.68, and covered the period from February 19, 2012 to June 24, 2012. JX81. Haldeman continued to pay Paradis an extra $300 in cash each month until his power of attorney was revoked.

the other residents.  Mrs. Tyson disliked eating frozen pizza for dinner and peanut butter and jelly sandwiches for lunch so Worrell prepared foods that her aunt liked and brought them to her.  Paradis, in turn, was annoyed by Worrell and Farrell, whom Paradis claimed would upset Mrs. Tyson by talking about Haldeman and calling him a thief.  Paradis testified that Mrs. Tyson became so upset that it would disturb the other residents of the home, and it would take Paradis several hours to calm her down.  On the other hand, Paradis thought very highly of Haldeman, and threatened to evict Mrs. Tyson after she revoked Haldeman's power of attorney unless she reappointed Haldeman as her agent.

Worrell testified that Paradis was often not present in the group home when she visited Mrs. Tyson.  Paradis operated another business that took her away from the group home for several hours during the day.  She left a teenaged niece to watch over the residents.  Worrell complained that the niece was always sleeping on the living room couch and neglecting the residents.

Meanwhile, Fifer had become suspicious of Haldeman because Haldeman would stop by the lawyer's office from time to time to talk about his aunt.  In March 2012, Haldeman asked Fifer to draft an assignment of lease for Mrs. Tyson to sign conveying her remaining half-interest in the Lewes Beach house to her nephew.  Haldeman told Fifer that his aunt wanted to assign her interest to him, but Haldeman also thought it was a good idea because a lawsuit had been filed as a

17

result of Mikey's accident. Fifer described Haldeman as extremely concerned about ensuring nothing happened to the other half-interest in the Lewes Beach house. Fifer drafted the document,[16] but then called Mrs. Tyson to confirm it was what she wanted. Mrs. Tyson informed Fifer that she absolutely did not want to convey anything further to Haldeman. In May 2012, after Farrell provided Mrs. Tyson with a portable phone, Fifer started to receive phone calls from Mrs. Tyson on a weekly basis expressing her dissatisfaction with and fear of her nephew. She also told Fifer that she wanted to change her estate plan.

What appears to have been the straw that broke the camel's back, so to speak, was an incident involving Mrs. Tyson's diamond pinky ring. According to Haldeman's daughter, Mrs. Tyson frequently had offered to give her this ring, but Trisha would always tell her great aunt to keep the ring on her finger until the time came when Trisha would inherit it. The last time this exchange happened, Mrs. Tyson was in the group home and Paradis overheard their conversation. Worrell testified that Mrs. Tyson had offered her the same ring on many occasions, and she would similarly demur until, finally, after Mrs. Tyson kept insisting, Worrell offered to take the ring to be cleaned. When she returned the ring to her aunt, Mrs. Tyson informed her that Haldeman was upset because he could have cleaned it and because he wanted the ring for his daughter, as well as some other pieces of Mrs.

---

[16] JX 17.

Tyson's jewelry. Mrs. Tyson continued to insist that Worrell take the ring, and Worrell finally accepted the gift at the end of May. When Mrs. Tyson informed Paradis that she wanted her niece to take the ring, Paradis responded that it was not right because she had already given the ring to Trisha.

After Worrell learned from her aunt that her cousin was upset about the gift, she called Haldeman. According to Worrell, Haldeman was irate and told her that it was his ring, and it was going to his daughter because she deserved it and Worrell did not. He said that his aunt was not competent and he could prove it, and screamed at Worrell when she claimed that Mrs. Tyson was fine. Worrell testified that she subsequently called her aunt, told her about the conversation with Haldeman, and asked if Mrs. Tyson wanted the ring returned to her. Mrs. Tyson said no.

On July 2nd, Fifer received a telephone call from Haldeman who was very upset because his aunt had given a diamond ring to Worrell when she had said previously that she was going to give the ring to Haldeman's daughter. He wanted to reverse the gift and asked if he could override the gift using the power of attorney and a letter from a doctor. After Haldeman informed Fifer that his aunt was in her right mind on some days and not on others, Fifer told Haldeman that there was nothing he could do if his aunt wanted to give the ring to someone else.

19

A short time later, a hysterical Mrs. Tyson told Worrell over the telephone to return the ring before noon the following day. When Worrell arrived at the group home, Mrs. Tyson informed her niece that Haldeman had visited the day before and waved papers in her face, saying that she was incompetent. He had threatened that if he did not have the ring by noon the following day, he was going to have her committed to the "poor house" in Smyrna. Worrell returned the ring to her aunt, and told her that she could no longer fight on her aunt's behalf because it was affecting her own health.[17] When her aunt called again the next day asking for help, Worrell turned her down and told her aunt: "if you want something done, you have to do it yourself."

Mrs. Tyson subsequently invited her niece to attend a meeting at the group home with Fifer on July 20, 2012. Worrell took her father with her, and Farrell was there as well. The discussion took place in Mrs. Tyson's small bedroom with Fifer leading the discussion and Mrs. Tyson actively participating. Mrs. Tyson said she wanted Haldeman out of her life. Worrell was asked to be Mrs. Tyson's attorney-in-fact, but Worrell refused. Farrell then suggested that Andersen might serve as Mrs. Tyson's agent, and Mrs. Tyson agreed to the suggestion. The

---

[17] After she returned the ring to her aunt, Worrell called Haldeman and left a voice message that was played by Haldeman in the courtroom. Among other things, Worrell told Haldeman that he was going to burn in hell, and that he was going to pay. JX 80.

meeting lasted one hour. When Fifer got back to his office about 30 minutes later, there was a message from Haldeman, who wanted to know why Fifer had visited his aunt. The next day, Mrs. Tyson called her niece and informed her that Paradis had been haranguing her about what she was doing to Haldeman, saying that Mrs. Tyson was not in her right mind and that Haldeman could prove it. When Worrell confronted Paradis about her conduct, Paradise informed her that Haldeman had been good to his aunt, and it was Mrs. Tyson's fault that Mikey had been killed.

On July 23, 2012, Mrs. Tyson executed a revocation of power of attorney and a new power of attorney appointing Andersen as her agent.[18] On July 24th, Andersen accepted her appointment. Haldeman was notified by certified mail that he had been removed as Mrs. Tyson's agent.[19] On August 2, 2012, Mrs. Tyson executed a new will that Fifer had drafted, which left her entire estate to Worrell.[20] On the same date, Mrs. Tyson executed an assignment of lease conveying her one-half interest in the Lewes Beach house to Worrell.[21] Fifer was later informed by Haldeman's attorney that Haldeman was Mrs. Tyson's agent under her health care

---

[18] JX 28 & 32.
[19] JX 29.
[20] JX 31.
[21] JX 30.

directive so Fifer drafted another document appointing Worrell as Mrs. Tyson's health care agent, which was executed by Mrs. Tyson on August 29, 2012.[22]

After her appointment as Mrs. Tyson's agent, Andersen contacted Haldeman to obtain the documents she needed to manage Mrs. Tyson's finances. She received checks from him, but he failed to give her a check register. Instead of the accounting she requested, Anderson got a handwritten list of checks Haldeman had written on his aunt's behalf without any supporting documentation. In the two months before his power of attorney was revoked, Haldeman had written checks to himself totaling $13,142 from Mrs. Tyson's account.[23] There was very little money left in Mrs. Tyson's account, and Andersen worried about having sufficient funds to pay for Mrs. Tyson's care. Meanwhile, Paradis was threatening to evict Mrs. Tyson. Farrell and Worrell considered returning Mrs. Tyson to her home, but Haldeman was adamantly opposed to that idea and threatened to make the Lewes Beach house unliveable by removing the refrigerator and stove.

By the end of August, Anderson had found a place for Mrs. Tyson in a home in Lincoln owned by Sandra Paredes.[24] The cost was $3500 per month, but Mrs.

---

[22] JX 33.

[23] JX 45 & 66. In fact, from March through July 2012, Haldeman wrote four checks on Mrs. Tyson's account to himself for a total of $22,742. JX 66.

[24] JX 45.

Tyson was the only resident besides the caregiver's family.[25] Mrs. Tyson had a large bedroom with two windows in a house where she was allowed to eat dinner with the family in the dining room, provided food such as tomatoes, fruits and vegetables that she enjoyed, and was given a shower for the first time in months. Everyone who talked with Mrs. Tyson or saw her after she was moved out of the group home testified that Mrs. Tyson was much happier and stronger that before.

By letter dated September 3, 2012, Andersen sought an accounting from Haldeman, and returned some unpaid utility and property tax bills for the Lewes Beach house that he had submitted to her for payment.[26] Andersen also sought Haldeman's cooperation if it became necessary to sell the Lewes Beach house. On September 20th, Haldeman responded to Andersen through his attorney, claiming that the funds removed from Mrs. Tyson's account were in repayment of loans from Haldeman, loans which exceeded $100,000 for which he was considering making a claim for repayment.[27]

Andersen remained concerned about the funds Haldeman had withdrawn from Mrs. Tyson's credit union account shortly before her appointment. If Mrs.

---

[25] Mrs. Tyson's monthly income barely covered this expense. Her total monthly retirement income was $3,556.82, and consisted of a Social Security retirement benefit in the amount of $1202, a Sunoco pension payment in the amount of $1618.75, and a Met Life pension payment of $736.97. JX 60.
[26] JX 46.
[27] JX 48.

Tyson had to move into a nursing home, she could be disqualified from receiving Medicaid if Andersen was unable to account for those funds. By letter dated October 10, 2012, Andersen again sought an accounting from Haldeman.[28] According to Andersen's own review of Mrs. Tyson's financial records, Mikey had stolen over $70,000 from Mrs. Tyson since January 2011, which would also preclude Mrs. Tyson from qualifying for Medicaid unless the money was paid back. Andersen requested Haldeman's cooperation in selling Mrs. Tyson's remaining assets, i.e., the Lewes Beach house and shares of Sunoco, Inc. that also had been transferred from her sole name to her name and Haldeman's name jointly. According to Andersen, when she tried to access the stocks online, an activation code was issued and sent to Haldeman's home address.[29] She asked him for the code in order to instruct the sale of the stocks online.

By letter dated October 24, 2012, Haldeman's attorney responded that his client had received a check in the amount of $12,615.26 from Computershare in his name and Mrs. Tyson's name jointly, apparently in total liquidation of the Sunoco

---

[28] JX 49.
[29] *Id.*

shares. [30] Haldeman also had received a dividend check in the amount of $100.80. [31] The attorney further stated:

> My client has asked me to make his position crystal clear. He is a joint owner of the stock account and the real property. Title to these items were transferred to him by Mrs. Tyson as gifts. He is not inclined to gift them back. His aunts[sic] wishes were quite clear, both in expression and delivery, when the gifts were made. Therefore, he will not relinquish his claims to either the stock account or the real property. [32]

Haldeman, however, did offer to split the check proceeds with Mrs. Tyson. By letter dated November 1, 2012, Haldeman's attorney confirmed that he had provided Fifer with two original checks from Computershare, with the understanding that Andersen would endorse the checks as POA for Mrs. Tyson, and return them to him for Haldeman's signature. [33] After both parties endorsed the checks, Haldeman's attorney was to deposit them into his escrow account and issue a check to Mrs. Tyson for one-half of the total amount. [34] Andersen endorsed the checks on November 1, 2012, and had them delivered by hand the following day. [35] Although Andersen had requested that the attorney send Mrs. Tyson's check as

---

[30] JX 49.

[31] At trial, Haldeman testified without elaboration that Mrs. Tyson received checks ranging between $75 and $100 every three or four months, which he would cash for his aunt. I assume that he was referring to other dividend checks.

[32] JX 49.

[33] JX 51.

[34] *Id.*

[35] JX 52.

soon as possible, Andersen never received a check from Haldeman's attorney before Mrs. Tyson died on November 7, 2012.[36] The first and final accounting of the Estate of Marjorie Lee Tyson lists the sum of $6,358.03 as an additional asset but, according to Fifer's testimony, no funds representing Mrs. Tyson's half of the Sunoco shares were ever received by the Estate.[37]

## II. Issues

Haldeman is seeking the rescission of Mrs. Tyson's will and the assignment of lease that conveyed Mrs. Tyson's half-interest in the Lewes Beach house to her niece. Haldeman bases his request for rescission on several different grounds. First, he argues that Worrell used fraud and misrepresentation to deprive him of his survivorship right to the Lewes Beach house. Second, Haldeman claims that he had entered into a contract with his aunt in 2008, i.e., Haldeman would get the beach house on his aunt's death in return for his promise to care for her for the remainder of her life. Therefore, he contends that rescission should be granted on the basis of promissory estoppel. Third, Haldeman argues that Worrell unduly influenced their aunt once she had unfettered access to Mrs. Tyson in the group

---

[36] JX 67.

[37] JX 70. In her letter dated November 1st, Andersen referred to another stock account with Computershare worth over $4400, and requested the online activation code from Haldeman so she could liquidate these shares as soon possible. JX 52. It does not appear that Haldeman responded with the code or that Andersen was able to liquidate the other account before Mrs. Tyson's death.

home and was able to convince Mrs. Tyson that Haldeman was stealing her money and forcing her to live in the group home rather than her own home. Fourth, Haldeman argues that Mrs. Tyson lacked testamentary capacity when she executed the documents on August 2, 2012. According to Haldeman, Mrs. Tyson was on mind-altering medications, suffered from short-term memory loss, and experienced hallucinations.

In response to Worrell's counterclaim alleging breach of fiduciary duty, Haldeman argues that he has already provided an accounting.[38] Even though he now concedes that he should not have commingled his funds with his aunt's funds, Haldeman contends that he only stepped into a fiduciary role in February 2012 when he took over his aunt's account and started paying her bills. He claims that he was not enriched and, in fact, he used his own funds to supplement his aunt's bank account. Finally, Haldeman argues that he is entitled to a refund of Mrs. Tyson's funeral expenses that he paid which were erroneously reported as an estate expense.

Worrell argues that Haldeman's claims of fraud and misrepresentation should be treated as waived under Court of Chancery Rule 9(b) because he failed

---

[38] Haldeman refers to JX 65 as his accounting. This exhibit consists of two typed pages listing payments totaling $26,460.79 made from Haldeman's checking accounts during 2012 allegedly on behalf of Mrs. Tyson, with photocopies of the checks and some invoices attached.

to allege them in the original complaint. Even if these claims are not waived, Worrell contends that Haldeman failed to prove each of the five elements of misrepresentation by a preponderance of evidence. According to Worrell, Mrs. Tyson trusted and relied on Haldeman, but he breached her trust. Worrell argues that it is inconceivable that Haldeman did not know that thousands of dollars were being siphoned from Mrs. Tyson's account when he was paying her bills and allegedly was supplementing her account with his own funds. As to Haldeman's claim of an oral contract, Worrell argues that the only evidence of a contract is Haldeman's own self-serving testimony. Worrell argues that Haldeman has failed by prove by clear and convincing evidence the existence of a contract to bequeath a future interest in real property.

Worrell also argues that Haldeman has failed to demonstrate by the preponderance of evidence any undue influence on her part. Instead, the evidence shows that Mrs. Tyson was mistreated by Haldeman and his son, who subjected her to bullying and a surveillance camera, restricted her visitors by making them uncomfortable, and effectively isolated her at the group home by refusing to allow her a telephone. Finally, Worrell argues that the hospice records demonstrate that Mrs. Tyson was alert and oriented, could converse easily, and showed no signs of suffering ill effects from medication. Mrs. Tyson was represented by an attorney who had met her several times and had talked with her over the telephone on

numerous occasions. This attorney determined that she had testamentary capacity. Haldeman only presented the testimony of a psychological counselor who is licensed in another jurisdiction and is unfamiliar with Delaware's legal standard for testamentary capacity.

Worrell also insists that a full accounting is needed because: (1) a confidential relationship had existed between Haldeman and Mrs. Tyson for a considerable period of time; (2) Haldeman had commingled Mrs. Tyson's funds with his own funds; and (3) Haldeman had paid bills with Mrs. Tyson's funds that were not for her benefit. Worrell acknowledges that Haldeman should receive credit for payment of the funeral bill as an offset of what he owes the Estate. Worrell argues, however, that Haldeman should deliver all the personal property belonging to Mrs. Tyson that are stored at his house and in a storage facility, and that the Estate is also owed $6358.03, representing one-half of the checks that were endorsed by Andersen as attorney-in-fact, which Haldeman refused to pay after claiming Andersen's authority had terminated upon Mrs. Tyson's death.

III. Analysis

A. Rescission of Will and Assignment of Lease.

Haldeman claims he is entitled to rescission of Mrs. Tyson's will and assignment of lease because of two misrepresentations allegedly made by

Worrell.[39]  First, Worrell encouraged Mrs. Tyson to believe that Haldeman was stealing from her even though there was no evidence that he was responsible for the money missing from Mrs. Tyson's account.  Second, because Worrell knew that her aunt wanted to leave the group home and return to her Lewes Beach house, Haldeman accuses Worrell of having induced Mrs. Tyson to revoke Haldeman's power of attorney, change her will, and convey her half-interest in the Lewes Beach house to Worrell in the erroneous belief that Worrell would then help Mrs. Tyson achieve her goal of returning home.  As a result, Haldeman lost his survivorship rights in the Lewes Beach house and, presumably, whatever interest he had in Mrs. Tyson's estate.[40]

Under Haldeman's theory, Mrs. Tyson was the victim of Worrell's alleged misrepresentations, not Haldeman.  However, nowhere does Haldeman claim that Mrs. Tyson who was damaged, nor can he make that claim.  Although Haldeman points out that Mrs. Tyson's goal of returning home was never achieved, he can hardly blame Worrell when the record shows that he was the one who prevented

---

[39] Haldeman argues that he has established the elements of rescission set forth in *Liberto v. Bensinger*, 1999 WL 1313662, at \*4 (Del. Ch. Dec. 28, 1999) :  (1) a false representation, usually one of fact, made by the defendant; (2) that the misrepresentation was material, or was intended or likely to induce the plaintiff to execute the contract; (3) the plaintiff's justifiable reliance on the misrepresentation; and (4) damage to the plaintiff as a result of such reliance.. *Liberto* involved a claim of innocent misrepresentation.

[40] Haldeman referred to his aunt's prior will during his testimony, but there is no evidence of Mrs. Tyson's prior testamentary scheme, if any.

Mrs. Tyson from returning to the Lewes Beach house by threatening to sell it or to make it unliveable.[41] Moreover, the evidence shows that Mrs. Tyson was much happier and even stronger after she was relocated from Paradis's group home to a private residence found by her new attorney in fact. The only person who was harmed by the turn of events is Haldeman, but not as a result of any alleged misrepresentations that Worrell made to him. Therefore, Haldeman is not entitled to rescission based on fraud or misrepresentation.

## B. Estoppel

Haldeman's theory of equitable estoppel is predicated on his claim that he and his aunt had entered into a contract in 2008 wherein he would receive the Lewes Beach house on his aunt's death in return for his promise to pay her bills and care for her for the remainder of her life. He argues that he would have fulfilled his end of the bargain but for Worrell's interference with his caregiving and financial oversight of Mrs. Tyson.

The proponent of an alleged oral contract must prove its existence and terms by clear and convincing evidence.[42] In this case, the terms of the alleged oral

---

[41] Hospice records dated August 24, 2012 reflect a telephone call from Haldeman to a social worker stating that he had heard that Mrs. Tyson was moving back to her home and that he did not want that to happen. JX84 at 254.
[42] *Barbato v. Davidson*, 1992 WL 103045 (Del. Ch. 1992).

contract are vague and ambiguous. At one point, Haldeman testified that in return for the entire beach house upon Mrs. Tyson's death, he initially agreed to pay the basic bills that his aunt could not pay until she was able to pay some of them. He also testified that he later realized that he would also have to pay the bills that she did not want to pay. His testimony leaves uncertain when the alleged agreement was made, which were the bills that he promised to pay and, in the event that Mrs. Tyson was able to pay some of her bills, what his continuing responsibilities would be. In addition, at no point during the trial did Haldeman testify that he had agreed to take care of his aunt; to the contrary, Haldeman testified that it was Mikey who apparently voluntarily gave up his construction business to care for his great aunt. Haldeman was only responsible for paying Mrs. Tyson's bills, which he claims he did only at her direction until she was moved to the group home in February 2012; thereafter, he took responsibility for her affairs as her fiduciary.

The record shows that Haldeman did, in fact, pay some of his aunt's expenses out of his own checking accounts. However, Haldeman also commingled his aunt's funds with his own funds. The supporting documentation in the record is far from complete. Some of the checks written out of Haldeman's two checking accounts cannot be positively attributed to Mrs. Tyson's personal expenses since there are no corresponding bills or even notations of creditor account numbers on

the face of the checks.[43]   Furthermore, the record of Mrs. Tyson's credit union statements and cancelled checks begins only in January 2011. [44] Since the alleged contract occurred in 2008, it is impossible to determine the extent to which Haldeman actually expended his own funds on his aunt's expenses.

The main weakness with Haldeman's claim of an oral contract is that the only evidence of a contract consists of Haldeman's own self-serving testimony. There is no corroborating evidence since Mrs. Tyson is dead and none of the other witnesses were aware of any alleged contract.  Moreover, the record includes a letter from Haldeman's attorney to Andersen dated October 24, 2012,[45] in which Haldeman emphatically claimed that his half-interest in the Lewes Beach house had been a gift from his aunt.  If so, then the joint tenancy with right of survivorship created by Mrs. Tyson in 2008 created at most a gift *causa mortis* which is revocable by the donor at will.[46]  As a result, Mrs. Tyson would have been acting entirely within her rights when she severed the joint tenancy in 2012 by conveying her half-interest to her niece.[47]   In light of Haldeman's previous admission that the 2008 assignment of lease was a gift, I do not find Haldeman's

---

[43] JX 62, 63, 65.
[44] JX 6, 60.  The first cancelled check is dated December 30, 2010.
[45] JX 50.
[46] *Peterman v. Peterman*, 2007 WL 2198765, at *6 (Del. Ch. 2007).
[47] *In re Matter of Ellingsworth*, 266 A.2d 890, 891 (Del. Ch. 1970).

self-serving trial testimony sufficiently clear and convincing to establish the existence of an oral contract to convey a future property interest.

## C. Undue Influence

Haldeman is also seeking rescission of Mrs. Tyson's will and assignment of lease on the basis of undue influence.[48] According to Haldeman, nothing can explain Mrs. Tyson's drastic change of her estate plans that previously were intended to benefit Haldeman except Mrs. Tyson's belief that he was stealing her money and forcing her to live in the group home instead of her Lewes Beach house. He blames Worrell for this change because, after Mikey's death, Worrell had uninterrupted access to Mrs. Tyson in the group home where she could exert her influence over Mrs. Tyson, as was overheard by Paradis. Haldeman points to the incidents involving Mrs. Tyson's diamond pinky ring and the teacups as evidence of how much Worrell would have wanted the Lewes Beach house. While Haldeman was taking care of his aunt, visiting her frequently, giving her money and, finally, making the tough decisions that were needed in the last year of her life, Worrell refused to help her aunt and paid her only occasional visits.

---

[48] A challenge to a will based on claims of undue influence or lack of testamentary capacity may be filed at any time prior to the entry of an order of probate or within six months after the entry of an order of probate. *See* 12 *Del. C.* §§ 1308 & 1309. Haldeman's complaint was timely filed even though he is seeking the remedy of rescission rather than review of proof of will. *See* 12 *Del. C.* § 1309.

In order to establish undue influence, a challenger to a will must demonstrate by the preponderance of evidence: (1) a susceptible testator; (2) the opportunity to exert influence; (3) a disposition to do so for an improper purpose; (4) the actual exertion of such influence; and (5) a result demonstrating its effect.[49] In this case, there is no dispute that Mrs. Tyson was a susceptible testatrix. She was elderly, dying of cancer, had Parkinson's disease, and was unable to walk more than a few steps. She was taking several medications, including painkillers, and experienced hallucinations from time to time. There is also no question that Worrell had the opportunity to exert influence when her aunt was in the group home and no longer under the direct supervision of Haldeman's son.

In large part, this case hinges on the credibility of the parties. Haldeman acted and sounded like an aggrieved person. Worrell sounded at times both indignant at what had befallen her aunt and also remorseful that she had not done more to help her aunt. The documents admitted as joint exhibits, however, shed some light on Mrs. Tyson's financial and emotional life in 2011 and 2012.

Mrs.Tyson received on average each month a total of $3556.82 in retirement income and benefits. She also owned equities, but other than some shares in Sunoco, Inc., which she owned jointly with Haldeman, the record is unclear as to the extent and value of her financial investments in 2011 and earlier. Haldeman

---

[49] *See Mitchell v. Reynolds*, 2009 WL 132881, at *8 (Del. Ch. Jan. 7 2009).

was a joint owner of her Lewes Beach house. Mrs. Tyson also owned at least one motor vehicle that Haldeman subsequently titled in his own name in September 2011 using the power of attorney.[50]

Mrs. Tyson had an account at the Sun East Federal Credit Union, which consisted of a primary shares account, a checking account, and a certificate of deposit.[51] Haldeman had been listed as POA on this account since around 2008.[52] Every month, $181.30 was automatically withdrawn from the checking account to pay the premium for a life insurance policy in the amount of $10,000, whose named beneficiary was Haldeman.[53] Every month, $500 was automatically transferred from the checking account into the primary shares account.

On January 1, 2011, Mrs. Tyson had $32,715.27 in her primary shares account and $2,954.64 in her checking account. On January 6th and again on January 18th, there was a phone transfer of $2000 from the primary shares account to Mrs. Tyson's checking account. Five checks cleared during this month, two of which had been signed by Mrs. Tyson made payable to her cleaning lady ($75

---

[50] JX 58.

[51] JX60.

[52] According to Haldeman's testimony, his aunt had instructed someone at the credit union to add him to her account. He went to Sun East with a folder containing paperwork he had from Mrs. Tyson, including the power of attorney and her will, and signed some papers there.

[53] JX 54. The application form was signed by Mrs. Tyson on November 17, 2008. The beneficiary was subsequently changed on October 24, 2012, to Mrs. Tyson's estate by Andersen in her capacity as Mrs. Tyson's attorney. *Id.*

each), one signed by Mrs. Tyson in the amount of $50, and two checks to Discovery ($2181.16) and another to "FIA CardServices Check payment" ($101.97).[54]  During this month, there were also 15 ATM withdrawals from the credit union, most frequently in increments of $500, for a total of $7000 in cash withdrawn from Mrs. Tyson's credit union account.

On February 1, 2011, Mrs.Tyson had $28,112.50 in her primary shares account and $252.85 in her checking account.  During this month, there was one phone transfer of $1000 and one mail transfer of $2000 from her primary shares account to Mrs. Tyson's checking account.  There was also a deposit of $7,500 into her checking account on February 10th.  Ten checks cleared during this month, nine of which were signed by Mrs. Tyson.  She paid her cleaning lady once ($75), fuel oil supplier twice ($238 & $357), two separate Comcast accounts ($60.84 & $65.84), AllState Insurance ($739.05), AARP ($16), and two checks in the amount of $500, one to herself and one to Haldeman.   Another check was paid to Discover ($866.88).[55]  There were nine ATM withdrawals during this month, for a total of $4000 in cash withdrawn from Mrs. Tyson's credit union account.

---

[54] Not all of checks written on Mrs. Tyson's Sun East account during this period were included in JX 7.  Photocopies of the checks included in the record reveals that Mrs. Tyson signed most of them, but Haldeman also signed some of his aunt's checks.

[55] Haldeman testified that he occasionally paid his aunt's Discover card bills. There is no question that Mrs. Tyson enjoyed shopping and used her credit card to

This pattern continued during the following months. As large cash withdrawals occurred, someone made periodic phone or mail transfers from the primary shares account to the checking account to avoid overdrafts.[56] There were also occasional deposits of funds from unknown sources. At the same time, Mrs. Tyson continued to sign checks to pay for her household expenses, utilities, insurance, federal taxes, and miscellaneous items, including several large checks to her handyman, Clarence Wright for back pay and work performed.[57] These records show that Mrs. Tyson was exercising some independence and control over her life, in spite of being essentially housebound. By August 1, 2011, however, Mrs. Tyson had only $1,405.06 remaining in her primary shares account and $2,123.06 in her checking account.

Haldeman blamed his aunt for these unaccountable cash withdrawals, claiming that she directed Mikey and others to withdraw the funds with her ATM card and then she spent the cash on fancy foodstuffs or gave it away as gifts.

---

buy merchandise through QVC and other home shopping television shows. She also returned a large number of the items she purchased, and received credits for those returns. JX 11.

[56] Looking only at the larger cash withdrawals, the records show: 15 ATM withdrawals for a total of $7,000 in January 2011; 9 ATM withdrawals for a total of $4,000 in February 2011; 19 ATM withdrawals for a total of $9,000 in March 2011; 20 ATM withdrawals for a total of $8,950 in April 2011; 18 ATM withdrawals for a total of $9,000 in May 2011; 23 ATM withdrawals for a total of $11,620 in June 2011; 15 ATM withdrawals for a total of $7,502 in July 2011.

[57] JX 61.

However, when Mrs. Tyson wanted cash or wanted to give someone cash, the records show that she wrote a check for cash. Worrell also testified that her aunt, like Worrell's father, came from a generation that did not use ATM cards. It is also difficult to believe that Mrs. Tyson would have spent over $57,000 on foodstuffs in seven months and then, shortly thereafter, would have complained to her niece about the complete depletion of her funds.

The account statements reveal that someone was overseeing and managing Mrs. Tyson's account by transferring funds from the primary shares account to the checking account when the balance was too low and, on occasion, supplementing Mrs. Tyson's account with additional funds. Haldeman testified that he only did what his aunt instructed him to do, including making deposits into her checking account, and he denied that he was acting in the capacity of a fiduciary during this time even though he was listed as power of attorney on Mrs. Tyson's account. He claimed that the credit union statements were sent to Mrs. Tyson's address and he never saw them despite asking his aunt to see the statements. The first time he saw one of his aunt's credit union statements, Haldeman claimed, was when he was preparing to move her to Lewes. Haldeman also testified that he only saw her bills when she provided them to him, and after he returned them to Mrs. Tyson, she had Mikey burn the bills in a burn pit in the backyard. During this time, however,

the record shows that Haldeman had several of his aunt's bills sent directly to him at his address in Millsboro so he could pay them.[58]

After Mrs. Tyson was moved to Lewes, her quasi-independence and control over her life were sharply reduced. No longer did she have a cleaning lady or handyman to oversee. No longer could she purchase anything on her own. Instead, a surveillance camera was placed in her living quarters and her visitors were monitored by Mikey. Her credit card was forcibly removed from her, and after November 4, 2011, she was no longer signing checks on her credit union account.[59] Haldeman testified that he was signing some of his aunt's checks at this time, not in his capacity as her agent, but at her request because her hands were shaking so badly that she was unable to sign the checks herself.

After Mrs. Tyson was moved to Lewes, the large cash withdrawals from her credit union account stopped. Instead of thousands of dollars in cash being withdrawn from ATM machines in $500 increments each month, the credit union statements show monthly cash withdrawals of a few hundred dollars in $100 or $200 increments, in addition to small cash withdrawals from ATM machines in local stores. This pattern continued until December 2011 when there were three

---

[58] JX 65. Haldeman also had the Computershare account information sent to his address in Millsboro. As a result, Haldeman received dividend checks on the Sunoco shares he owned jointly with Mrs. Tyson. At trial, Haldeman testified that he would cash the dividend checks for his aunt.

[59] JX 6.

ATM cash withdrawals each in increments of $500, followed by a total of $1450 in cash withdrawals in January 2012, and $1000 in two $500 cash withdrawals in the first two days of February 2012.[60]

Tragically, Mikey was killed on February 3, 2012, leaving Mrs. Tyson without a caregiver. While she was temporarily placed at the Hospice Center, Haldeman claims to have explored the options and found that Mrs. Tyson could not afford a nursing home or in-home care. In addition to witness testimony, the record is replete with hospice notations indicating that Mrs. Tyson clearly wanted to return to her home. Haldeman, however, decided that the only feasible option for Mrs. Tyson was Annie's Elder Care at $2700 per month. His own testimony, however, belies that conclusion. According to Haldeman, the in-home caregiver would have cost $75 per day, plus room and board, with weekends off. Assuming that another caregiver at the same cost could have been found to cover the weekends, the monthly expense of in-home care for Mrs. Tyson would have been approximately $2300, plus "room and board" expenditures that had would have been similar to what had been spent for Mrs. Tyson and her previous caregiver, Mikey. It is possible that the total monthly cost of in-home care would have been

---

[60] During this time period, there were two deposits totaling $5000 into Mrs. Tyson's checking account from unknown sources. By the end of February 2012, Mrs. Tyson had a balance of $1,438.04 in her primary shares account and $4,837.04 in her checking account. JX 60.

slightly more than $2700 a month, but Mrs. Tyson had sufficient income to cover the expense and she wanted to be in her own home.

Haldeman told everyone that his aunt did not have the income to return to her own home. However, the Lewes Beach house contains two separate apartments, only one of which was needed by Mrs. Tyson for her residence. Haldeman apparently gave no thought to renting out one of the apartments to raise additional income for his aunt's needs. Haldeman also apparently gave no thought to refinancing the Lewes Beach house, or to selling shares of stock that Mrs. Tyson owned in order to raise additional funds for his aunt's needs.[61] Haldeman was a joint tenant with right of survivorship in both the Lewes Beach house and the Sunoco stock. Had he refinanced the Lewes Beach house or sold the shares of Sunoco stock to raise funds for his aunt's care, Haldeman would have deprived himself of the additional value of these assets that he expected to receive upon Mrs. Tyson's death. His refusal to allow Mrs. Tyson to return to her home was a breach of his fiduciary duty of loyalty to his principal. However, since there was no one in a position to gainsay him, Haldeman moved his aunt into a group home

---

[61] The record shows that the Lewes Beach house had a fair market value of $400,000 at this time, and there was apparently no mortgage on the property. Since Mrs. Tyson was a joint owner, her half-interest was worth $200,000. Mrs. Tyson also was a joint owner of shares of Sunoco stock, but there is no record of the value of her stock holdings in February 2012.

against her wishes, which was the first time, ironically, that Haldeman claimed to be acting as Mrs. Tyson's agent.

Although Haldeman argues that once Mrs. Tyson was in the group home, his cousin had unfettered access to Mrs. Tyson and was able to influence her to change her estate plans and sever the joint tenancy with right of survivorship, there is another, far more likely, explanation for Mrs. Tyson's actions than undue influence. Mrs. Tyson had been angry at Haldeman for a considerable time. Her funds had been depleted and Haldeman had removed her from Boothwyn where she had some control over her life to Lewes where she had essentially none. Haldeman claimed that the move was partially motivated by his desire to control his aunt's spending. However, it was Mikey who was going to the ATM machines at the banks and stores, not Mrs. Tyson. By moving Mikey to Lewes, Haldeman could also control Mikey's spending of Mrs. Tyson's money. The large cash withdrawals essentially stopped upon Mrs. Tyson's and Mikey's arrival in Lewes, but then the withdrawals began to increase again in December 2011. Around the same time, Worrell was noticing a decline in Mikey's appearance and behavior; he was losing weight and looked glazed at times. She smelled what she thought was burning rope from his apartment and suspected drug use, but she did not report it because her aunt was aware of Mikey's situation and made excuses for him.

Although Mrs. Tyson loved Mikey and apparently tolerated his drug use, she did not like her phone or credit card being taken away from her. She also did not like being spied and eavesdropped upon, or being forced to live in an inferior group home or being threatened with the poor house if she did not retrieve her diamond pinky ring from Worrell. Both parties testified about their aunt's strong character and it is apparent that Mrs. Tyson could no longer tolerate the way she was being treated by the person she had trusted and had appointed to be her agent. So she removed Haldeman as her attorney in fact for breach of trust and severed the joint tenancy so he would not receive another gift from her. She also changed her will and left her entire estate to Worrell. Haldeman's abuse of his aunt's trust is the more likely explanation for Mrs. Tyson's change in her estate plans, not undue influence by Worrell. Since the evidence shows a more plausible alternative explanation for Mrs. Tyson's behavior in severing the joint tenancy and naming Worrell as the beneficiary of her estate, I conclude that Haldeman has failed to establish by the preponderance of evidence that the assignment of lease and will executed on August 2, 2012, were the products of undue influence.[62]

D. Lack of Testamentary Capacity

---

[62] *See In the Matter of the Estate of Aldon S. Hall*, 2014 WL 4948188 (Del. Ch. Oct. 2, 2014).

In Delaware, the standard for testamentary capacity is that one who makes a will must, at the time of execution, be capable of exercising thought, reflection and judgment, and must know what she is doing or how she is disposing of her property.[63] She must possess sufficient memory and understanding to comprehend the nature and character of her act. [64] There is, moreover, a presumption that the testatrix has the capacity to make a will, so the party challenging testamentary capacity has the burden of establishing that the decedent was legally incapable of executing a valid will.[65]

At trial, Haldeman presented the testimony of Dr. Marie Gray, a nationally certified psychologist and licensed professional counselor in Pennsylvania,[66] as an expert witness to opine on Mrs. Tyson's susceptibility to undue influence and her capacity to make informed decisions when she executed her assignment of lease and her will on August 2, 2012.[67]   Dr. Gray had never met Mrs. Tyson, but she

---

[63] *In the Matter of the Purported Last Will and Testament of Alice Langmeier*, 466 A.2d 386, 402 (Del. Ch. 1983).

[64] *Id.*, citing *In re Estate of Bandurski*, 281 A.2d 621 (Del. Ch. 1971); *Rodney v. Burton*, 86 A. 826 (Del. Super. 1912); *Pritchard v. Henderson*, 50 A. 217 (Del. Super. 1901).

[65] *Id.* at 389.

[66] JX 72.

[67] Prior to trial, Worrell objected to Dr. Gray's testimony because she was not licensed in Delaware and had never testified in Delaware.  Furthermore, Worrell questioned her credentials and sought to subject her to a *Daubert* hearing.  At trial, Worrell's attorney attacked, among other matters, Dr. Gray's educational background, her licensure, and her publication record.  The minimal weight I am giving to Dr. Gray's opinions is based less on her background and credentials and

reviewed the Delaware Hospice records from August 23, 2011 to November 7, 2012, prescription requests and medication inventories, a Do Not Resuscitate Order dated August 19, 2011, and records provided by Paradis, including information on medications that were administered to Mrs. Tyson.[68]

During the trial, Dr. Gray described at considerable length the types of medications that had been prescribed for Mrs. Tyson, as well as their side effects. The symptoms she saw in the records led Dr. Gray to conclude that Mrs. Tyson, in addition to her hallucinations and dementia,[69] was suffering from anxiety and paranoia as a result of (a) having incurable cancer, (b) being unable to be maintained in her own home, and (c) having tragically lost a significant caregiver. According to Dr. Gray, Mrs. Tyson was never able to reconcile the fact that she was not capable of going back to her home, and Mrs. Tyson continued to struggle with that fact throughout the records Dr. Gray reviewed. According to Dr. Gray,

---

more on the fact that she had limited information about Mrs. Tyson's circumstances, her character, and her relationships with the parties.

[68] JX 73 & 91.

[69] There was no medical testimony presented that Mrs. Tyson was suffering from dementia during this time. Hospice records contained two hearsay statements that she was suffering from mild dementia. The hospice workers who testified at trial corroborated that Mrs. Tyson was normally alert and oriented to person, place and time, although she sometimes lost track of time. The senior social worker from hospice who had the most familiarity with Mrs. Tyson testified that she never saw dementia, only some periods of confusion or short-term memory loss, in Mrs. Tyson. According to Dr. Gray, however, having dementia means that a person is not competent to make decisions, although Dr. Gray acknowledged that dementia becomes progressively more severe over time.

anyone holding out a false hope that Mrs. Tyson might return home could have influenced Mrs. Tyson. Dr. Gray also opined that the medications Mrs. Tyson had been prescribed would have impaired her cognitive ability and judgment, and an attorney who did not have long-term knowledge of Mrs. Tyson's functioning would not have been able to determine her ability to make sound decisions or exercise sound judgment.

After reviewing Dr. Gray's testimony and the entire record of the trial, I have decided to give little to no weight to Dr. Gray's opinions because she was provided only a limited picture of Mrs. Tyson's circumstances. Dr. Gray accepted without question that Mrs. Tyson did not have the financial means to return to her own home. The evidence, on the other hand, demonstrates that Mrs. Tyson had the financial means but was denied the opportunity to return home by her fiduciary. Dr. Gray saw Mrs. Tyson's evident agitation and distress as signs of anxiety and paranoia, which she described as symptoms of a person who could not accept her loss of independence and autonomy. The evidence shows, however, that Mrs. Tyson was capable of regaining and did, in fact, regain some measure of her independence and autonomy when she chose another fiduciary, and thereby substantially eliminated her agitation and distress.[70] Dr. Gray saw in Mrs. Tyson's

---

[70] Hospice records for August and September 2012 reflect that, for the most part, Mrs. Tyson was alert, oriented to person, place and time, relaxed and calm. JX 84. Although Mrs. Tyson was a little anxious about leaving the group home because

behavior a lack of trust in her fiduciary, and described this as a symptom of Mrs. Tyson's paranoia. However, the evidence shows that Mrs. Tyson was justified in her lack of trust in an agent who ignored her directives and wishes and was abusive to her.

At trial, Dr. Gray conceded that that she was not familiar with the legal standard for testamentary capacity in Delaware. Nevertheless, Dr. Gray opined that it was negligent of Fifer to have met with Mrs. Tyson without a social worker, a psychiatrist who had been treating her, or a medical practitioner who had an ongoing knowledge of Mrs. Tyson's history and her current state of mind. While Haldeman argues that Fifer had only limited contact with Mrs. Tyson, the record shows that Fifer met with Mrs. Tyson at least twice during 2008, once in October 2011, and several times in July and August 2012. He also spoke with Mrs. Tyson on the telephone numerous times starting in the spring of 2012.

According to the testimony of Fifer and Andersen who were present during the October 2011 meeting, Mrs. Tyson was angry and upset about Haldeman who was acting as her power of attorney. She felt abused by Haldeman and Mikey because they were monitoring her, taking phones away from her, and taking her credit card. She wanted to have Haldeman removed as her power of attorney, and she wanted to change her will and the manner in which her estate was going to be

she did not know what to expect in her new placement, she was looking forward to the move. *Id*.

48

disposed of when she died. Although Mrs. Tyson wanted to remove Haldeman's name from the deed of the Lewes Beach house, the attorneys were unsure of how to advise her and no concrete action was taken in October 2011.

Haldeman appears to argue that her failure to act in October 2011 meant that Mrs. Tyson did not want to make any changes. However, in October 2011, Mrs. Tyson was still living in her own home with Mikey as her caregiver. When Fifer met Mrs. Tyson in July 2012, she repeated the same concerns as before, but now she was determined to make the changes to her estate plan and power of attorney. Mikey was dead, Mrs. Tyson was in a group home rather than her own home, and Haldeman recently had abused and threatened her. When Mrs. Tyson met her attorney again on July 23rd and August 2nd, Fifer questioned his client extensively and concluded that Mrs. Tyson had the requisite capacity to execute the documents he had drafted.[71]

In particular, on August 2nd, Fifer met with Mrs. Tyson privately to review the draft assignment of lease and will with her, to ascertain that she had the legal capacity to sign them, and to make sure that she understood the contents of these documents and that those contents were, in fact, what she wanted. Fifer testified that he had prepared a checklist of questions to ask Mrs. Tyson, including asking her who she was, who were her friends and where did they reside, what day it was,

---

[71] Haldeman never challenged the July 23rd revocation of his power of attorney or the July 23rd appointment of Andersen as Mrs. Tyson's new power of attorney.

who was the president of the United States, what her assets were, and how she wanted they disposed. Fifer read the will to Mrs. Tyson, and she affirmed it was her will and she wished to sign it. Fifer then called in the witnesses, and repeated his questions and read the will again in front of the two witnesses.[72] He repeated the same process with the assignment of lease, and was satisfied that Mrs. Tyson had the capacity to execute those documents on August 2nd. In light of this evidence, I conclude that Haldeman has failed to demonstrate that Mrs. Tyson lacked the capacity to execute a new will and an assignment of lease on August 2, 2012.

### E. Worrell's Request for an Accounting

Haldeman has opposed Worrell's request for an accounting of his handling of Mrs. Tyson's finances, claiming that he was not acting in the capacity of a fiduciary for his aunt until February 2012, and that the accounting he provided in Joint Exhibit 65 is sufficient. Even though he was appointed power of attorney for Mrs. Tyson in October 2008, and was named power of attorney on her credit union account, throughout the trial, Haldeman attempted to shield himself from responsibility for his pre-February 2012 activities by claiming that he had no actual

---

[72] Andersen was one of the two witnesses to Mrs. Tyson's execution of the documents on August 2, 2012. Andersen testified that Fifer asked Mrs. Tyson a more extensive list of questions to determine her capacity than he normally asked his clients. Like Fifer, Andersen had no concern about Mrs. Tyson's testamentary capacity.

knowledge of his aunt's finances, and only wrote checks on her account, made inquiries on her behalf, or paid her bills when Mrs. Tyson told him to do so.

A formal fiduciary relationship, such as the relationship between a ward and his guardian or between a principal and her agent, does not have to exist in all cases for a fiduciary relationship to arise.[73]  Here, even if I were to accept Haldeman's testimony at face value, the evidence shows that Mrs. Tyson placed her special trust in her nephew to help manage her financial affairs.  In 2007 and 2008, Mrs. Tyson was an elderly widow with no children of her own.  She had a debilitating disease, i.e., Parkinson's, which affected her ability to walk and use her hands.  She had been diagnosed with a cancer that proved to be untreatable.  She had vision problems.  She needed people to transport her to medical care, clean her house, maintain her property, prepare her food, and help her to handle her finances.  She had friends, hired help, and hospice workers, but Haldeman was the nephew whom she had accepted into her home when he was a homeless teenager and they had enjoyed a close relationship throughout the ensuing years.   Now, their situations had reversed and Mrs. Tyson was dependent upon Haldeman's help.  And, according to Haldeman, he began traveling from Millsboro to Boothwyn about every two weeks to provide his help.  When his own health began to

---

[73] *Mitchell v. Reynolds*, 2009 WL 132881, at * 9.

deteriorate, he made the decision to move Mrs. Tyson closer to his home in order to oversee her finances more easily, according to his testimony.

The evidence shows that Haldeman and Mrs. Tyson enjoyed a confidential relationship at least as early as when he started paying her bills around 2006. Haldeman breached his aunt's trust in 2012 when he refused to allow Mrs. Tyson to return to her own home after Mikey's death. As a result, an examination of his handling of Mrs. Tyson's finances is warranted. Haldeman's commingling of his aunt's funds with his own funds raises red flags, as does his retitling of his aunt's car in his own name and his failure to provide supporting documentation and an accounting to Andersen. Another red flag is the fact that Haldeman refused to pay over to Mrs. Tyson's estate the $6,358.03 he owed Mrs. Tyson after Andersen endorsed the checks that were issued by Computershare prior to Mrs. Tyson's death.

I recommend that the Court order a full accounting from Haldeman of his handling of Mrs. Tyson's finances because the record is insufficient to determine how much money the Estate of Marjorie L. Tyson is owed, if any, for his breach of trust. In order to obtain a baseline for Mrs. Tyson's assets, the accounting should include all assets Mrs. Tyson owned immediately prior to the time Haldeman started to pay his aunt's bills or gained access to her credit union account, whichever event came first. The accounting should include complete statements

from Haldeman's bank accounts as well as Mrs. Tyson's credit union account and any other financial investment accounts she may have had. Any bills that Haldeman claims to have paid with his own funds on Mrs. Tyson's behalf should be supported by copies of bills, invoices, statements, or receipts from the creditors. The accounting should be filed in the Court nine months after this report becomes final.

F.  Mrs. Tyson's Personal Property

Having rejected Haldeman's challenge to Mrs. Tyson's will, I find that the Estate is entitled to any of Mrs. Tyson's personal property that Haldeman has stored at his residence, in any commercial storage unit, or that is located in the Lewes Beach house. I recommend that the Court order Haldeman to deliver all of the personal property at his residence in any commercial storage unit directly to Worrell, and order Haldeman to allow Worrell free access to the Lewes Beach house for her to obtain the personal property that now belongs to the Estate.

G.  The Lewes Beach House

In his complaint, Haldeman is seeking as an alternative remedy, if rescission is not granted, the partition of Lewes Beach house. Worrell does not appear to oppose partition. Therefore, I recommend that the Court enter an order partitioning the property and appointing a trustee to sell the property to the best

53

and highest bidder, and to distribute the net proceeds in conformity with a subsequent order of the Court.

IV.    Exceptions to Draft Report

Haldeman filed timely exceptions to my draft report's factual findings and legal conclusions regarding his claims of fraud, misrepresentation, estoppel, undue influence, and lack of testamentary capacity.  Haldeman also took exception to my draft report's conclusion that he owed a fiduciary duty to his aunt prior to February 12, 2012.   For the reasons that follow, I am rejecting Haldeman's exceptions and adopting my draft report as my final report as herein modified.

A.  Exceptions to Factual Findings

Haldeman argues that there is no evidence that he was aware of Mrs. Tyson's finances before August 2011, when he moved his aunt to Lewes. According to Haldeman, when he started paying some of his aunt's bills in 2006, he simply took Mrs. Tyson at her word when she said that she did not have the money to pay them.  Mrs. Tyson also refused to show him her credit union statements and directed them to be burned in her back yard by Mikey.  Haldeman claims that he did not see any of his aunt's credit union statements until shortly before he moved her to Lewes, and then he was shocked to discover the state of his aunt's finances.

Haldeman also argues that there was no evidence showing when he was first named as power of attorney ("POA") on his aunt's credit union account. He contends that the 2008 POA was revoked by Mrs. Tyson when she executed another POA in Pennsylvania in 2009. Since Haldeman did not sign the acknowledgement page of the 2009 POA,[74] Haldeman argues that he was not a fiduciary and had no obligation to oversee his aunt's finances. Even if he were a fiduciary, Haldeman argues that the scope of his agency did not extend to protecting his aunt from writing large checks to her handyman or protecting his aunt from others. Haldeman contends that there is no evidence that he made the large ATM cash withdrawals from Mrs. Tyson's credit union account, and claims that Mrs. Tyson ratified those transactions by virtue of having received the credit union statements at her address.

Haldeman's testimony was self-serving. The only people who could have corroborated or did partially corroborate his testimony were deceased (Mrs. Tyson and Mikey), self-interested (Haldeman's daughter), or biased (Anna Mae Paradis).[75] Haldeman testified that his son closed his Milton construction business

---

[74] Mrs. Tyson executed a Pennsylvania POA naming Haldeman as her attorney-in-fact on July 21, 2009, but the copy in the record does not contain Haldeman's signature on the acknowledgement page. JX 8.

[75] Haldeman gave Paradis $300 in cash each month for "extras" for Mrs. Tyson. There are receipts in the record suggesting that Paradis may have spent this money on "extras" for Mrs. Tyson, but the total of these receipts is less than $200. JX 61.

in 2007 or 2008 to move to Boothwyn in order to care for his great-aunt without compensation. However, it appears from the record that Mikey had a history of drug and alcohol problems, owed restitution in Delaware and, during the time he was caring for Mrs. Tyson in Pennsylvania, he was incarcerated for a few weeks. While Mikey was in jail, Haldeman and his daughter took turns staying with Mrs. Tyson. Haldeman regularly traveled from his home in Millsboro, Delaware to Mrs. Tyson's Boothwyn residence every two weeks, ostensibly to check on his aunt. In the summer of 2011, Haldeman decided to move Mrs. Tyson and Mikey to Lewes, installing them both in the Lewes Beach house. Mrs. Tyson was given no warning or choice in this move, according to Farrell. It does not appear that Mikey was given any choice either. Looking at the evidence as whole, it appears that Haldeman had been supervising his aunt's living arrangements at least since the time Mikey moved into Mrs. Tyson's Boothwyn residence.

Haldeman assumed the formal mantle of a fiduciary when he went to his aunt's credit union in 2008 with a folder containing Mrs. Tyson's will and power of attorney in order to have his name added to his aunt's credit union accounts as

Mrs. Tyson's subsequent attorney-in-fact refused to give Paradis any additional funds. Paradis's hostility to Worrell was palpable at trial and contrasted greatly with her admiration of Haldeman.

her POA.[76] He claimed that he did so at his aunt's direction. He also testified that when his aunt told him that she needed more money, he would deposit money into her accounts. His testimony in this regard is consistent with the 2011 credit union statements that show funds being transferred by mail or phone from Mrs. Tyson's savings account to her checking account, in addition to direct deposits of funds into her savings account.[77] Nevertheless, Haldeman claims that everything he did was at his aunt's direction.

In March 2012, Haldeman told Fifer that he was acting at his aunt's direction when Haldeman asked the attorney to draft an assignment of lease conveying Mrs. Tyson's undivided one-half interest in the Lewes Beach house to the other joint owner, Haldeman himself. According to Fifer, Haldeman told him that Mrs. Tyson was worried about a lien being attached to her Lewes Beach house as a result of lawsuit that was filed after Mikey's death. However, Fifer testified that Haldeman appeared extremely concerned, if not obsessed, with ensuring that nothing happened to the other half-interest in the Lewes Beach house. After Fifer

---

[76] JX 60. Haldeman's name is listed as POA on Mrs. Tyson's Sun East Federal Credit Union statements that are in the record. However, the record only contains statements from 2011 to 2012.
[77] *Id.*

drafted the document that Haldeman had requested,[78] he contacted Mrs. Tyson who informed Fifer that she did not want to convey anything to Haldeman.

Nearly two years earlier, in July 2010, Haldeman, acting in his capacity as his aunt's agent, had contacted a Pennsylvania attorney to have the name of Mrs. Tyson's stepson removed from the title of her Boothwyn residence.[79] This effort was apparently unsuccessful.[80] Then in 2011, Haldeman, again acting in the capacity as his aunt's agent, changed the title of his aunt's car into his own name in order to move the car to Lewes.[81] In July 2012, Haldeman contacted Fifer and proposed using his POA and a doctor's letter to show that Mrs. Tyson was not competent when she gave her diamond pinky ring to Worrell so Haldeman could retrieve the ring from his cousin.

Although these incidents appear isolated, they form a pattern. Haldeman would state that he was acting at his aunt's direction or would use his POA in order to gain control over his aunt's property or to retrieve property that his aunt had

---

[78] JX 17.

[79] JX 9. The letter states that the attorney was informed that Mrs. Tyson might have been tricked into transferring the property to her stepson.

[80] According to Worrell, Mrs. Tyson had transferred title to her Boothwyn residence to her stepson while retaining a life estate for herself. *See Haldeman v. Worrell*, Del. Ch., C.A. No. 8282-MA, Pre-Trial Stipulation and Order, Docket Item ("DI") 33.

[81] JX 58. Haldeman testified that he had to transfer the car's title into his name to get a temporary tag to move it to Lewes. However, he never transferred the title back into his aunt's name.

given away. Whether her gifts were large, i.e., the Boothwyn residence, or small, i.e., a collection of teacups or a diamond pinky ring, Haldeman intervened whenever his aunt gave away her possessions or spent her money unless the gifts were to himself, his son or his daughter. After a Pennsylvania hospice worker accused Mikey of stealing from Mrs. Tyson, Haldeman's response was not to remove Mikey from Mrs. Tyson's home, but to remove Mikey and Mrs. Tyson from Pennsylvania. After Mrs. Tyson was in Lewes, he took away Mrs. Tyson's credit card because she was buying too much merchandise through home shopping networks. However, once Mrs. Tyson returned to Lewes, she was able to receive frequent visits from Farrell and Worrell, who heard her complaints about Haldeman's and Mikey's handling of her finances and bank statements.

Haldeman provided an "accounting" of the bills he paid on behalf of his aunt, but it is only a list of checks allegedly written on his bank accounts.[82] It is incomplete because (1) it begins in 2012 and (2) there are no supporting documents to verify the expenditures. Haldeman testified that as soon as Mrs. Tyson confirmed that he had paid her bills, she directed Mikey to burn the invoices in the backyard of her Boothwyn residence. After Haldeman moved his aunt to Lewes, he claimed to have continued the practice of burning Mrs. Tyson's bills at his home in Millsboro, even though Worrell had warned him to be careful handling

[82] JX 65.

their aunt's finances after Mrs. Tyson's meeting with Fifer and Andersen at Worrell's home in October 2011.

Not all of Mrs. Tyson's bills were addressed to Mrs. Tyson's Boothwyn residence. Some were sent to Haldeman's address in Millsboro, including the Lewes Beach house property tax bill,[83] Mrs. Tyson's Discover credit card bill,[84] and her Comcast bill. Mrs. Tyson's Computershare account statements, including her Sunoco dividend checks, were also sent to the Millsboro address.[85] Haldeman's claim that he was merely acting at his aunt's direction and not as her fiduciary rings hollow in light of Fifer's testimony and Haldeman's ability to have Mrs. Tyson's bills redirected to his Millsboro address.

Overall, I found Haldeman's testimony lacked credibility. It is inconceivable that Haldeman was blind to the state of his aunt's finances before August 2011, and that he was acting only at his aunt's direction until February 2012, when he placed her in the group home contrary to his aunt's wishes. I found

---

[83] JX 59.

[84] JX 64.

[85] JX 51. According to Haldeman's testimony, Mrs. Tyson had given half of her stock to her stepson after her husband's death and later, without telling Haldeman, she had sold all her remaining stocks except Sunoco. Mrs. Tyson received Sunoco dividend checks every few months which sometimes Haldeman would cash for her. The record, however, shows that Mrs. Tyson and Haldeman were listed as joint tenants on the Sunoco account. JX 49. Haldeman provided no testimony as to when or how his name was added as a joint owner of his aunt's Sunoco shares, but his attorney's letter to Anderson after Anderson had replaced Haldeman as his aunt's agent indicated that the shares had been a "gift" from Mrs. Tyson. JX 50.

Worrell, Buckaloo, Farrell, Fifer, and Anderson to be more credible witnesses. Therefore, I am dismissing Haldeman's exceptions to my factual findings.

### B. Rescission of Will and Assignment of Lease due to Fraud and Misrepresentation.

In his second exception, Haldeman argues that Mrs. Tyson's Last Will and Testament and Assignment of Lease that were executed on August 2, 2012, should be rescinded because of fraud and misrepresentation by Worrell. According to Haldeman, Worrell had elevated herself to a position of trust and confidence in their aunt's eyes by promising to rescue her from the group home and return her to her Lewes Beach house. Worrell also had convinced Mrs. Tyson that Haldeman was stealing from her.

In my draft report, I addressed the merits of Haldeman's argument without first examining the issue of waiver under Court of Chancery Rule 9(b) raised by Worrell.[86] In her Answering Brief on Exceptions to the Master's Draft Report, Worrell again argues that Haldeman waived his opportunity to raise this argument.

An examination of the record shows that Haldeman did not make any claim of fraud, fraudulent misrepresentation, or equitable fraud in his pleadings. The

---

[86] Ct.Ch.R. 9(b) provides: *"Fraud, mistake, condition of the mind.* In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally."

first time the words "fraud" or "fraudulent misrepresentation" appear is in Section II ("Nature of the Action and Background Facts") of the Pre-Trial Stipulation and Order.[87] In the Plaintiff's portion of Section II, Haldeman alleged that his prayers for rescission were based on "Ms. Tyson's lack of mental capacity, undue influence, and fraud," and that Mrs. Tyson "was the victim of fraudulent misrepresentations by [Worrell] through her repeatedly accusing [Haldeman] of stealing Tyson's money."[88] However, Haldeman failed to include an explicit claim of fraud or fraudulent misrepresentation when he requested the following amendments to his pleadings in Section VI ("Amendments to the Pleadings") of the Pre-Trial Stipulation and Order:

1. During depositions Plaintiff first learned that the Assignment of Lease executed by Tyson in favor of Worrell was in fact not a gift but an incomplete straw conveyance in which the one-half (1/2) interest in the Beach House held by Tyson, and seemingly conveyed to Worrell, was to be returned to Tyson. Worrell was merely holding title in trust for Tyson. To the extent his new information amends the pleadings, the Plaintiff asks to have the court recognize this newly discovered argument.

2. Despite the initiation of this litigation soon after Tyson's death, Worrell submitted the contested Will to probate; failed to identify John as next-of-kin to the Register of Wills thereby deleting John Haldeman from any notice of activity in the Office of the Register of Wills; and failed to include any of Tyson's personal property in the Estate's inventory. To the extent an amendment is necessary to incorporate this information into the pleadings, it is so moved.

---

[87] Pre-Trial Stipulation and Order. DI 33.

[88] *Id.*

3. The Estate failed to reimburse John Haldeman for the funeral costs of Marjorie Tyson despite knowledge of its payment.[89]

As shown above, Haldeman did not employ the pre-trial stipulation process to request an amendment to his complaint for a claim of fraud or fraudulent misrepresentation. Had he done so, Worrell would have had the opportunity to object to the proposed amendment prior to trial.[90] And had the Court allowed the amendment, Worrell's trial strategy might have been different. Haldeman did not raise a claim of rescission due to fraud and misrepresentation until he filed his Post-Trial Opening Brief.[91] This was both untimely and unfair to Worrell.[92] Therefore, I conclude that Haldeman waived his right to make this argument.

In the alternative, if the Court does not find any waiver, I conclude that Haldeman's argument is meritless for the same reason I provided in my draft report: a claim of fraudulent misrepresentation does not lie where the recipient of the alleged misrepresentation has suffered no pecuniary loss or harm. Although Haldeman now argues that fraudulent misrepresentation is interpreted more broadly by this Court and includes losses suffered by third parties, citing *NACCO*

---

[89] *Id.*

[90] Court of Chancery Rule 16(c) provides that "all pretrial orders shall include the following information: …. (5) Any amendments of the pleadings desired by any party, with a statement as to whether it is unopposed or objected to, and if objected to, the grounds therefor."

[91] Plaintiff's Opening Post-Trial Opening Brief, at 15-18. DI 42.

[92] *See Zaman v. Amedeo Holdings, Inc.*, 2008 WL 2168397, at *15 n.56 (Del. Ch. May 23, 2008).

*Industries, Inc. v. Applica, Inc.*,[93] Haldeman still fails to state a claim of fraudulent

misrepresentation because he does not allege to have acted or refrained from action

in reliance upon anything Worrell said or promised.

Similarly, Haldeman's argument that he has a claim for equitable fraud is

without foundation. Although equitable fraud is broader than common law fraud

in that it does not require a showing of *scienter*, and may provide a remedy for

negligent or even innocent misrepresentation, Haldeman must still plead the

existence of a special relationship between the parties,[94] i.e., between Haldeman

and Worrell. Since Worrell and Haldeman had little interaction with each other,

---

[93] 997 A.2d 1, 29 (Del. Ch. 2009) ("Where fraud is claimed based on a statement in an Exchange Act filing, the reliance inquiry plays an important role in legitimizing a Delaware Court's ability to provide a remedy. Delaware's common law fraud remedy does not provide investors with expansive, market-wide relief. That is a domain appropriately left to the federal securities laws, the SEC, and the federal courts. Our law instead requires that a plaintiff show reliance, and our Supreme Court has declined to permit the fraud-on-the-market theory to be used as a substitute. … This does not mean that common law fraud only protects against misrepresentations made directly from one party to another. To the contrary, '[o]ne who makes a fraudulent misrepresentation is subject to liability to the persons or class of person whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation, for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influence.'") (citations omitted).
[94] *See Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *13 (Del. Ch. Dec. 22, 2010) "While certain requirements are relaxed, a plaintiff claiming equitable fraud must sufficiently plead a special relationship between the parties or other special equities, such as some form of fiduciary relationship or other similar circumstances, which common law fraud does not require." (footnote omitted).

the fact that Mrs. Tyson confided her financial concerns to her niece does not state a claim of equitable fraud.  Therefore, I dismiss this exception to my draft report.

## C.  Estoppel

Haldeman argues that I misunderstood the evidence concerning his interest in the Lewes Beach house.  He contends that it is irrelevant whether the 2008 Assignment of Lease was a gift from his aunt or repayment for services he had rendered.  What matters is that Haldeman had an oral contract with his aunt whereby he promised to continue providing for Mrs. Tyson's care and financial support for the duration of her life in exchange for the other one-half interest in the Lewes Beach house upon her death.  According to Haldeman, he lived up to his bargain and, if not for Worrell's interference, he would have continued to care for his aunt until her death.  According to Haldeman, it is inequitable that he should receive only one-half interest in the Lewes Beach house after spending "most of his life, most predominantly between 2006 and 2012 caring for his aunt" while Worrell receives the other one-half interest after she refused to accept responsibility as Mrs. Tyson's agent.[95]

Haldeman ignores the fact that I recommended denial of his estoppel claim because of the lack of clear and convincing evidence of an oral contract between

---

[95] Plaintiff's Opening Brief on Exceptions to Master's Draft Report, at 14.  DI 55.

Mrs. Tyson and Haldeman. There was only Haldeman's inconsistent, vague, and self-serving testimony. Therefore, I am dismissing this exception.

D. Undue Influence

Haldeman takes exception to my conclusion that he failed to demonstrate Worrell's undue influence over Mrs. Tyson. He contends that until February 2012, he and his son were the only people in Mrs. Tyson's life who cared for her. Haldeman points out that there was no testimony refuting that: (1) he did not have access to his aunt's credit union account; (2) he did not see any of his aunt's credit union account statements; and (3) he only did what his aunt told him do. Haldeman compares the lengthy duration and closeness of his relationship with Mrs. Tyson to that of Worrell, who only visited or spoke with Mrs. Tyson infrequently over the years. He argues, therefore, that the drastic changes in Mrs. Tyson's estate plan, her POA, and her assignment of her half-interest in the Lewes Beach house to Worrell must have been the product of Worrell's undue influence over Mrs. Tyson in the last few months of Mrs. Tyson's life.

As I stated in the draft report, this case hinged upon the credibility of the witnesses. To be blunt, I did not find Haldeman or Paradis to be credible witnesses. The record from the trial reveals that Mrs. Tyson was very unhappy with the way she was being treated by Haldeman and Mikey. She did not like having her credit card and phone taken away from her, being spied upon, being

forced to live in an group home, and being threatened with placement in the "poor house" if she did not retrieve a diamond pinky ring from Worrell. I concluded that the more likely explanation for Mrs. Tyson's change in her estate plans was Haldeman's abuse of her trust and his mistreatment of her, not any undue influence exerted by Worrell. I see no reason to change my analysis and, therefore, dismiss this exception.

### E. Testamentary Capacity and Capacity to Execute a Deed

Haldeman takes exception to my reliance on the lawyers' testimony in concluding that Mrs. Tyson had the requisite capacity to execute a will on August 2, 2012.[96] According to Haldeman, Mrs. Tyson's serious medical conditions should have given pause to the lawyers, yet Fifer and Andersen only relied upon a vague list of questions to evaluate Mrs. Tyson's capacity on the day she executed her will. Haldeman contrasts the attorneys' testimony with that of Dr. Gray who spoke at length about the different medications that were being prescribed for Mrs. Tyson, their possible side effects, and their cumulative effect on her capacity to make important decisions.

Dr. Gray, who is a psychologist and a licensed professional counselor in Pennsylvania, never met Mrs. Tyson and was not familiar with the legal standard for testamentary capacity in Delaware. Consequently, I gave little weight to her

---

[96] JX 31.

testimony on the issue of Mrs. Tyson's capacity to execute a will. Fifer, on the other hand, is a Delaware attorney with considerable experience in drafting wills and handling estate matters. He had performed legal work for Mrs. Tyson starting in 2008, and had met with her on several occasions, as well as talked with her by phone. The testimony of Fifer and his partner Andersen, who witnessed the execution of Mrs. Tyson's will on August 2, 2012, was entirely credible. In my draft report, I concluded that Haldeman had been unable to overcome the presumption that Mrs. Tyson had testamentary capacity when she executed her will on August 2, 2012. None of his current arguments persuade me to alter my previous conclusion.

On the same day that she executed her will, Mrs. Tyson executed an assignment of lease whereby she transferred her one-half interest in the Lewes Beach house to Worrell.[97] Haldeman now complains that there was no discussion in my draft report of the relevant standard for executing a deed; instead, I only discussed the more stringent capacity test applicable to wills.

In briefing this exception, Haldeman first argued that there was no evidence demonstrating that Mrs. Tyson had the mental capacity to understand what she was doing when she executed the deed, i.e., that she was severing Haldeman's right of survivorship and conveying her one-half interest in the Lewes Beach house to

[97] JX 30.

Worrell. After Worrell responded that the burden of proving incompetency rests on the challenger,[98] Haldeman now contends that the standard enunciated in M*cCloskey v. McCloskey* should be used in determining whether Mrs. Tyson lacked the capacity to execute the assignment of lease.[99]

In *McCloskey*, the Court recited the following standard for rescission of a deed due to incapacity:

> [a] grantor lacks capacity if, by reason of mental illness or defect, he is (a) unable to understand in a reasonable manner the nature and consequences of a transaction, or (b) he is unable to act in a reasonable manner in relation to the transaction and the other party has reason to know his condition. [100]

The Master had applied this standard and had recommended that the Court rescind a deed executed by an elderly father which conveyed to his youngest son a piece of property that many years earlier the father had promised to leave to his oldest son. The basis for the Master's recommendation was twofold: first, because the father could not convey to one son property that he was contractually bound to convey to another son, and second, because the father lacked capacity at the time he signed the deed.[101]

---

[98] *See Townsend v. Townsend*, 137 A.2d 381, 382 (Del. Ch. 1957).

[99] *McCloskey v. McCloskey*, 2014 WL 4364469 (Del. Ch. Sept. 3, 2014).

[100] *Id.* at *12 (quoting *McCloskey v. McCloskey*, 2014 WL 1824712, at *9 (Del. Ch. Apr. 24, 2014) (Master's Final Report)).

[101] *Id.* at *1.

The Master found clear and convincing evidence that the father had promised to leave his oldest son a home and surrounding property at his death in exchange for his oldest son's promise to pay for repairs and improvements to the property, which the son did for 47 years until his father's death. [102] Not only did the oldest son pay for the repairs and improvements as promised, he and his wife lived with and cared for the father and the father's father until their respective deaths. [103] Nevertheless, two years before the father's death and three years after the father had been diagnosed with Alzheimer's dementia and declared incompetent to handle his own financial and medical affairs, [104] the father executed a deed conveying a portion of the property to his youngest son for no consideration.

The youngest son was aware of his father's diagnosis since he had been actively involved in his father's medical care during this time as well as being in control of his father's finances. [105] In fact, prior to the execution of the deed, the youngest son had asked his father's doctor to perform a cognitive test that showed the father had moderate cognitive impairment. [106] Even though he conceded that his father was of diminished capacity at the time of the deed transfer, the youngest

---

[102] *Id.* at **10-12
[103] *Id.* at **1-5.
[104] *Id.* at *7.
[105] *Id.*
[106] *Id.*

son took exception to the Master's recommendation, arguing he and his father had discussed the proposed transfer several years earlier.[107] The Court dismissed the exception as illogical, accepted the Master's recommendations and, *inter alia*, entered a judgment declaring the deed rescinded.[108]

Haldeman attempts to draw parallels between his case and the facts in *McCloskey*. While there are some superficial similarities, there are also some significant differences. First, I did not find clear and convincing evidence of any oral contract between Haldeman and Mrs. Tyson regarding the disposition of her Lewes Beach house after her death. Second, there was no medical evidence that Mrs. Tyson lacked capacity at the time she executed the assignment of lease on August 2, 2012. Although the parties agree that Mrs. Tyson was suffering from terminal cancer and was being given narcotic drugs to reduce pain and sedatives to reduce anxiety, there was no medical evidence demonstrating that these medications had incapacitated her mentally. In addition, while there was credible evidence that Mrs. Tyson had suffered a few hallucinations and had some short-term memory loss, there was no medical evidence that Mrs. Tyson had been diagnosed with dementia.[109]

---

[107] *Id.* at *17.

[108] *Id.*

[109] Haldeman testified that after he moved his aunt into Paradis's group home in February 2012, he felt that his aunt's mental condition was deteriorating so he asked a doctor to evaluate her competency and obtained a letter from a doctor. In

There was no evidence that Mrs. Tyson was suffering from a mental illness or defect on August 2, 2012, which would have rendered her incapable of understanding in a reasonable manner the nature and consequences of her assignment of lease or which would have made her incapable of acting in reasonable manner in relation to this transaction. There is nothing unreasonable about Mrs. Tyson's decision to convey her undivided one-half interest in the Lewes Beach house to her niece after Mrs. Tyson's experiences while under her nephew's supervision and care. Therefore, I am dismissing Haldeman's exception.

F. Demand for an Accounting

In my draft report, I found that Haldeman and his aunt had enjoyed a close relationship from the time he was in high school, a close relationship that developed into a fiduciary one as Mrs. Tyson became dependent upon Haldeman's help. As a result, I recommended that he prepare an accounting of his handling of Mrs. Tyson's financial affairs from the time when he first started paying some of his aunt's bills, which apparently was in 2006, or when he gained access to his aunt's credit union account, whichever event came first. Haldeman has taken exception to this recommendation, arguing that there is no evidence of a confidential relationship between him and Mrs. Tyson. He points to his aunt's sound mind and independence, the physical distance between them, his infrequent

response to Worrell's hearsay objection, Haldeman stated that he was only trying to demonstrate that he had received a letter. JX 18.

72

visits, the financial statements that were sent to her home, and the regular contact Mrs. Tyson had with other people.

There was no testimony from any disinterested witnesses who might have described Haldeman's relationship with Mrs. Tyson prior to August 2011 when he moved her to Lewes. Most of what I heard about their relationship came from Haldeman himself. The factual findings in my draft report were based on witness testimony, my assessment of each witness's credibility, my review of the documentary evidence, and what I believe to be reasonable inferences drawn from the record. I reject Haldeman's argument that Mrs. Tyson was not dependent on his help until February 2012 because his argument is based primarily on his trial testimony, which I did not find credible. Therefore, I am dismissing this exception to my draft report.

G.  Miscellaneous

Haldeman took exception to my failure to address Worrell's administration of Mrs. Tyson's estate, specifically, the fact that Worrell reported to the Register of Wills that the estate paid the funeral bill when, in fact, he had paid it. In response, Worrell does not dispute that Haldeman paid the funeral bill, but argues that this issue should be an element of the accounting and not a separate payment.

Haldeman counters Worrell's response by arguing that this and other errors in the documents she filed in the Register of Wills Office reflect Worrell's lack of

veracity. These errors were pointed out during the trial, and Worrell and Fifer explained the circumstances in which they occurred. I found them to be credible witnesses, notwithstanding the minor errors in the estate filings which can be corrected once this litigation is resolved. Therefore, I am rejecting this last exception to my draft report.

V.    Conclusion

For the reasons stated above, I am dismissing Haldeman's exceptions to my draft report and adopt my draft report as my final report, as modified herein. I recommend that the Court deny Haldeman's complaint in its entirety except for the request for partition of the Lewes Beach house, and I recommend that the Court grant Worrell's counterclaim and order a full accounting from Haldeman of Mrs. Tyson's financial affairs. The parties are referred to Rule 144 for the process of taking exception to a Master's Final Report.